Argued and submitted December 23, 1997, affirmed October 28, 1998

STATE OF OREGON,
*Respondent,*

*v.*

MATTHEW MONROE CAPELL,
*Appellant.*

(CR95-617B; CA A94532)

966 P2d 232

David E. Groom, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

Armstrong, J., dissenting.

**EDMONDS, J.**

Defendant appeals his convictions for possession and delivery of a controlled substance. ORS 475.992(4)(a); ORS 475.992(1)(a). He assigns as error the denial of his motion to suppress evidence. We affirm.

The facts are uncontroverted. Zowie Clark, acting on her own initiative and without the encouragement of any law enforcement agent, recorded a phone conversation that occurred in her residence between her 19-year-old son and defendant. The son lived with Clark, who provided for his support. The conversation was recorded with a component of her telephone equipment. In the conversation, defendant and Clark's son discussed an illegal drug transaction that was to occur later that day. Clark turned the recording over to the police, who used the information to arrest defendant. Defendant moves to suppress evidence of a controlled substance found in his possession and his recorded statements pursuant to 18 USC §§ 2510 to 2521 (the act). No issue under Oregon law was raised to the trial court. The trial court ruled that the statutes did not apply to the circumstances in this case. Defendant appeals after being found guilty in a stipulated facts trial.

18 USC § 2511 provides, in part:

"(1) Except as otherwise specifically provided in this chapter any person who —

"(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

"* * * * *

"shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)."

18 USC § 2511(4) provides for criminal penalties for violating 18 USC § 2511(1), and 18 USC §§ 2511(5), 2520 provide for civil penalties for the same violation.

18 USC § 2510(5)(a)(i) provides the basis for an exception to section 2511(1). It defines "electronic, mechanical, or other device" to mean

"any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—

"(a)   any telephone * * *, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic service communication in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business * * *[.]"

Also, 18 USC § 2515 provides:

"Whenever wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

Defendant stipulates that the tape recording was made by Clark using a recording device connected to the telephone in her family home and that she was concerned about her son's well-being. He argues, however, that those facts do not defeat suppression of the evidence under the act. 18 USC § 2510(5)(a)(i) is commonly referred to by the federal case law as the "domestic telephone extension exception" to section 2511. Most of the federal courts that have considered the reach of the act in the context of a parent-child relationship have held that the exception applies to the recording of conversations that are pertinent to a child's well-being. They hold that Congress did not intend to regulate the use of a personal telephone system that is tantamount to overhearing a conversation on one's phone in one's residence. *See, e.g., Newcomb v. Ingle,* 944 F2d 1534, 1536 (10th Cir 1991), *cert den* 502 US 1044 (1992) (holding "[t]here is no persuasive reason why Congress would exempt a business extension and not one in the home. The difference between listening on the extension and tapping the line within a home in the context here is not material."). *See also Scheib v. Grant,* 22 F3d 149, 154 (7th Cir), *cert den* 513 US 929 (1994) (holding that the use of an extension phone to record a son's phone conversation with his mother fell within section 2510(5)(a)(i) because

"[w]e cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for the child's well-being"); *Anonymous v. Anonymous*, 558 F2d 677, 679 (2d Cir 1977) (holding that the husband's recording of the wife's telephone conversations with her eight-year-old daughter regarding a custody dispute did "not rise to the level of a violation of [the] statute").

Although we are not bound by decisions of the lower federal courts, we may find their decisions to be instructive when we interpret federal statutes. *Derby Assn. Trust v. Dept. of Ins. and Finance*, 114 Or App 389, 392 n 5, 835 P2d 149 (1992). Our goal, of course, is to carry out the intent of Congress when it promulgated the act. The texts of sections 2511 and 2510(5)(a)(i), when read together, demonstrate an intent by Congress to exempt parents from criminal and civil penalties when they act in the interests of the well-being of their children. The reference to the use of telephone equipment issued to the user and being used by the user in the ordinary course of business includes use for personal affairs. In sum, the facts in this case are the kind of facts that fall within the language of section 2510(5)(a)(i).

To the extent that there could be any doubt about what Congress would have intended in light of the facts in the case, the legislative history underlying the act expressly states that Congress did not want "to make it a crime for a father to listen in on his teenage daughter or some such related problem." Hearings on the Anti-Crime Program Before Subcomm No 5 of the H J Comm, 90th Cong, 1st Sess, 901 (1967). Finally, the recording of conversations by a parent in the interest of a son's well-being simply is not the kind of concern that Congress had when it focused on interception of communications by private individuals. Rather, its concern was with wiretapping for purposes of commercial espionage and marital litigation. *See* S Rep No 1097, 90th Cong, 2d Sess, *reprinted in* 1968 US Code Cong & Ad New, 2274. In light of the language of 18 USC § 2510(5)(a)(i), the legislative history and the purpose of the act, we conclude that Clark's recording of the telephone conversation between her son and defendant by telephone equipment in her residence did not violate 18 USC § 2511.

Even if a violation of 18 USC § 2511 occurred, the suppression of the tape recording and its derivative evidence under section 2515 would be contrary to Congressional intent, as evidenced by a decision of the United States Supreme Court and by the legislative history underlying the statute. In *Scott v. United States*, 436 US 128, 98 S Ct 1717, 56 L Ed 2d 168 (1978), the officers intercepted, pursuant to a court order for a one-month period, virtually all conversations that occurred on a particular telephone. Approximately 40 percent of the intercepted calls were calls authorized to be intercepted by the order. The act requires that court-authorized wiretapping or electronic surveillance be conducted in such a manner as to minimize the interception of communications. The petitioners sought exclusion of the evidence of the intercepted conversations before the Supreme Court on the ground that section 2515 required suppression, even though suppression would not have been required under the Fourth Amendment. The Court rejected that argument, holding:

> "Any lingering doubt [about petitioner's argument] is dispelled by the legislative history which, as we have recognized before in another context, declares that § 2515 was not intended 'generally to press the scope of the suppression role beyond present search and seizure law.' S. Rep., 1097, 90th Cong., 2d Sess., 96 (1968)." *Scott*, 436 US at 139.

The Sixth Circuit in *United States v. Murdock*, 63 F3d 1391 (6th Cir 1995), *cert den* 517 US 1187 (1996), held similarly. Although that court declined to hold that there was a blanket domestic exception[1] under the act, it also held that suppression was not required because the scope of the suppression provision under section 2515 tracks the Fourth Amendment. Under the Fourth Amendment, the deterrent of unlawful police conduct is the goal of the exclusionary rule. *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968). Here the police engaged in no unlawful conduct, so the goal of the exclusionary rule would not be furthered by suppression.

---

[1] In *Murdock*, the defendant was convicted of tax evasion based on evidence of a telephone conversation recorded by his wife disclosing a bribe that the defendant had received.

Defendant's other arguments do not warrant discussion. For these reasons, we conclude that the trial court correctly denied defendant's motion to suppress.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority affirms the denial of defendant's motion to suppress the tape recording of his conversation with Zowie Clark's son. Because Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 USC § 2510 *et seq.*, requires the exclusion of the tape recording and all evidence derived from it, I respectfully dissent.

Before I reach the merits of this case, I believe it is necessary to review the nature and origin of Title III in order to understand how it operates in this case. Title III was developed against a background of Supreme Court rulings on the interception of private communications under the Fourth Amendment. Those rulings followed a path from *Olmstead v. United States*, 277 US 438, 48 S Ct 376, 72 L Ed 944 (1928), in which the Court held that interception of telephone conversations did not violate the Fourth Amendment unless the interception was accomplished through an unlawful entry into a constitutionally protected area, to *Katz v. United States*, 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), and *Berger v. New York*, 388 US 41, 87 S Ct 1873, 18 L Ed 2d 1040 (1967), in which the Court held that conversations that people intend to be private are entitled to the same Fourth Amendment protection against search and seizure as are tangible things, making a physical trespass immaterial. S Rep No 1097, 90th Cong, 2d Sess 66 (1968), *reprinted in* 1968 USCCAN 2153.

The state of federal law before the passage of Title III has been described as

"the worst of all possible solutions[.] * * * Private citizens and public officials could ignore the prohibition against wiretapping without fear of prosecution, while law enforcement officers could not use electronic surveillance to investigate and prosecute even the most serious crimes."

Wayne R. LaFave and Jerold H. Israel, 1 *Criminal Procedure* § 4.2, 365 (1984) (internal quotation marks omitted). Although Title III was drafted to allow law enforcement agencies to use electronic surveillance in limited circumstances, the overriding concern of the drafters of the law was the protection of privacy. *Gelbard v. United States*, 408 US 41, 48, 92 S Ct 2357, 2361, 33 L Ed 2d 179 (1972). That concern is most clearly reflected in the fact that, unlike the search and seizure limitations of the Fourth Amendment, the restrictions imposed by Title III apply to private parties as well as to the government. *Cf. Burdeau v. McDowell*, 256 US 465, 41 S Ct 574, 65 L Ed 1048 (1921). In summary,

"Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized."

S Rep No 1097, 90th Cong, 2d Sess 66 (1968), *reprinted in* 1968 USCCAN 2153. A telephone conversation is a wire communication. *See Briggs v. American Air Filter Co., Inc.*, 630 F2d 414, 417 (5th Cir 1980). Wire communications, unlike oral communications, are protected against interception by electronic, mechanical and other devices regardless of the speaker's expectation of privacy. *Compare* 18 USC § 2510(1) *with* 18 USC § 2510(2). With that in mind, I turn to this case.

Defendant contends that Clark's recording of her son's telephone conversation without his consent was an interception that violated Title III. The majority concludes that Clark's actions are not covered by the statute, because the statute does not prohibit parents from recording their child's telephone conversations in the family home. The majority reaches that conclusion by relying on certain federal court of appeals decisions that reached similar conclusions. The majority does not supply the context in which those cases were decided, however, and I conclude that it is only when viewed in context that we can understand how those decisions were reached and why they do not bear on the proper resolution of this case.

The cases cited by the majority were decided either on the basis of an implied exception in Title III for intrafamilial wiretapping or on the basis of the "ordinary course of business" exception found in 18 USC § 2510(5)(a)(i). Accordingly, it is necessary to analyze those exceptions in order to show why they do not apply to this case.

The idea that there is an implied exception in Title III for communications involving family members originated in *Simpson v. Simpson*, 490 F2d 803 (5th Cir), *cert den* 419 US 897 (1974). *Simpson* involved tape recordings made by a husband who "harbor[ed] uncertainties as to his wife's faithfulness." He attached a recording device to the telephone lines within his home and recorded conversations between his wife and another man.[1] He then played those tapes to various neighbors and family friends, as well as to a lawyer, on whose advice the wife agreed to an uncontested divorce. After the divorce, the wife brought an action for civil damages under Title III. The court concluded that, even though "the naked language of Title III, by its inclusiveness" prohibited the husband's actions, Congress had not intended for Title III to extend to those areas normally left to the states—areas such as the marital home and domestic conflicts. *Id.* at 805. The court based that conclusion on its examination of the legislative history, which it concluded demonstrated that Congress did not intend to prohibit interspousal wiretapping. To bolster its thesis, the court pointed to section 2510(5)(a)(i), which, without explaining its reasoning, the court interpreted as allowing eavesdropping over an extension telephone in the family home, and concluded that that exemption was "indicative of Congress'[s] intention to abjure from deciding a very intimate question of familial relations, that of the extent of privacy family members may expect within the home [in relation to] each other." *Id.* Accordingly, the court dismissed the wife's claim.

The majority of courts that have addressed the issue of interspousal eavesdropping or wiretapping after *Simpson* have rejected that court's holding and analysis.[2] The first

---

[1] The court's opinion does not give specific details as to the type of recording device.

[2] *See United States v. Murdock*, 63 F3d 1391 (6th Cir 1995), *cert den* 116 S Ct 1672 (1996); *Thompson v. Dulaney*, 970 F2d 744 (10th Cir 1992); *Heggy v. Heggy*,

challenge to *Simpson* came from the Sixth Circuit in *United States v. Jones*, 542 F2d 661 (6th Cir 1976). *Jones* was a criminal prosecution in which the defendant had been charged with intercepting his estranged wife's telephone conversations and using the contents of those conversations. The district court had ruled that the defendant's conduct fell within an implied exception to Title III for purely interspousal wiretaps placed on telephones within the marital home. *Id.* at 663-64. On appeal, the court concluded that the unambiguous language of the statute imposed a blanket prohibition on all electronic surveillance except under circumstances specifically identified in the statute. *Id.* at 667. After concluding that there was no *express* exception for communications involving domestic relations, the court analyzed the legislative history of Title III and concluded that Congress had, indeed, understood that the statute would affect domestic relations and that it had fully intended to do so. Had Congress intended to exclude domestic relations from the statute's coverage, the court reasoned, it would have included a specific exception. *Id.* at 671. Among other factors too numerous to detail in this opinion, the court supported its analysis with the hearing testimony of Professor Robert Blakey, who was publicly credited with having drafted Title III. Blakey stated: "Private bugging in this country can be divided into two broad categories, commercial espionage and marital litigation." *Id.* at 668-69 (quoting *Hearings on the Right to Privacy Act of 1967 Before the Subcomm on Administrative Practice & Procedure of the Senate Comm on the*

---

944 F2d 1537 (10th Cir), *cert den* 503 US 951 (1991); *Kempf v. Kempf*, 868 F2d 970 (8th Cir 1989); *Pritchard v. Pritchard*, 732 F2d 372 (4th Cir 1984); *United States v. Jones*, 542 F2d 661 (6th Cir 1976); *Kratz v. Kratz*, 477 F Supp 463 (ED Pa 1979); *People v. Otto*, 831 P2d 1178 (Cal), *cert den* 506 US 956 (1992); *Rickenbacker v. Rickenbacker*, 226 SE2d 347 (NC 1976). The harshest criticism of *Simpson* is found in *Kratz*. In dismissing the notion that there was an implied exception for communications involving domestic relations, the *Kratz* court decried the "Humpty-Dumpty method of jurisprudence" that had led to the result in *Simpson*. *Kratz*, 477 F Supp at 470. The court further described the *Simpson* conclusion as "untenable," "unjustifiable" and a "blatant disregard of the explicit language of Title III." *Id.* at 470-72. The few courts that have embraced the *Simpson* approach are a very small minority. *See, e.g., Perfit v. Perfit*, 693 F Supp 851, 856 (CD Cal 1988) (citing extension telephone exception as "an expression of Congressional intent to exclude from Title III the interception of telephone conversations taking place within the marital home"); *Lizza v. Lizza*, 631 F Supp 529 (ED NY 1986).

*Judiciary*, 90th Cong, 1st Sess, pt 2, 413 (1967)).[3] The court also noted that a comment by the Senate bill's sponsor, Senator Hruska, which was joined by Senators Dirksen, Scott and Thurmond, confirmed that Congress was aware that Title III's prohibition of private surveillance would apply to domestic relations: "A broad prohibition is imposed on private use of electronic surveillance, *particularly in domestic relations* and industrial espionage." S Rep No 1097, 90th Cong, 2d Sess (1968), *reprinted in* 1968 USCCAN 2274 (emphasis added). The court concluded that

> "the legislative history of this section, testimony at congressional hearings, and debates on the floor of Congress, inescapably lead to the conclusion that [Title III] establishes a broad prohibition on all electronic surveillance and that a principal area of congressional concern was electronic surveillance for the purposes of marital litigation."

*Jones*, 542 F2d at 669.

Every other federal circuit court that has considered the subject since the Sixth Circuit's decision in *Jones* has rejected the notion of an implied exception for domestic communications. I agree with those courts. There is no implied exception in Title III for communications involving domestic relations. The plain language of the statute allows for no implied exceptions, and the legislative history clearly shows that Congress was aware of intrafamilial wiretapping and sought to regulate it.

That leaves the question whether the exception found in section 2510(5)(a)(i), commonly referred to as "the extension phone exception" or, alternatively, the "ordinary course of business exemption,"[4] applies to intrafamilial eavesdropping, at least in the instance of parent-child wiretapping. The application of that exception has been considered by a number of courts in three different situations: (1) interspousal wiretapping; (2) commercial wiretapping—

---

[3] Although Blakey was testifying in support of a separate antiwiretapping bill, the blanket prohibition against private surveillance suggested by Blakey was incorporated into Title III. *Jones*, 542 F2d at 667 n 10.

[4] Although a majority of courts has referred to the exception as the "extension telephone exemption," the latter term more accurately reflects the language of the statute.

specifically, employers placing recording devices on their telephones in order to intercept employee conversations; and (3) parent-child wiretapping.[5]

Under section 2510(5)(a)(i), an interception does not violate Title III if it is made by a communications subscriber in the ordinary course of business, using equipment provided by a communications carrier in the ordinary course of its business or purchased by the subscriber from a retailer of communications equipment and connected to the communications carrier's facilities.[6] The draft legislation originally referred specifically to extension telephones and did not include the qualification that the interception had to be done in the ordinary course of the subscriber's business, but it was rewritten to add the latter language before the final legislation was passed. Although there is no clear statement of Congress's reasoning behind the change in the provision, the general consensus is that the new language was added in

---

[5] Although the only issue presented in this case is the right of a parent to intercept or record the telephone conversations of an adult child, in order to analyze that issue properly, it is necessary to discuss the other types of wiretapping as well.

[6] 18 USC § 2510(5) provides, in part:

" '[E]lectronic, mechanical or other device' means any device or apparatus which can be used to intercept a wire, oral or electronic communication *other than*—

"(a) any telephone or telegraph instrument, equipment, facility, or any component thereof, (I) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business[.]"

(Emphasis added.) The language "provider of wire or electronic communication service" was added to the statute as part of the Electronic Communications Privacy Act of 1986 in order to "reflect the reality that numerous companies now compete with each other to offer a variety of telecommunications services." Clifford S. Fishman & Anne T. McKenna, 1 *Wiretapping and Eavesdropping* § 2:30, 2-36 (2d ed 1995). The language "furnished by such subscriber or user for connection to the facilities of such service" was added at the same time to " 'clarify that telephone equipment provided by the user and connected to the facilities of the service provider is not a * * * "device," provided it is used in the ordinary course of the user's business.' " S Rep No 99-541, 99th Cong, 2d Sess 13 (1986), *reprinted in* 1986 USCCAN 3555, 3567, *quoted in* Fishman & McKenna, § 2:30, at 2-36 n 8. Under the statute as amended, therefore, telephone equipment purchased from a retail outlet such as Radio Shack would not be a "device," provided it was used in the ordinary course of the user's business. The exception applies only to standard telephone equipment and does not apply to equipment specially designed or modified for wiretapping. Fishman & McKenna, § 7:4, at 7-4.

response to concerns raised by Professor Herman Schwartz, who testified on behalf of the American Civil Liberties Union. *See, e.g., Anonymous v. Anonymous*, 558 F2d 677, 679 (2d Cir 1977) ("the [ordinary course of business provision] was added to the House Bill after Professor Herman Schwartz testified for the ACLU before the House Judiciary Committee that he feared that the original version of the bill, which had no such language, would permit policemen and private intruders to enter others' homes and listen in on extension phones without penalty").[7] Apart from Professor Schwartz's testimony, there is no other discussion of the exception in the legislative history. Indeed, the exception is not even listed in the introductory portion of the Senate Report, which lists all the other specified exclusions.[8] Accordingly, those courts interpreting the provision have seized on Professor Schwartz's testimony as the definitive statement of congressional intent, at least insofar as extension telephones are concerned.

In those cases where the wiretap has involved spouses, most courts have concluded that, even if the first prong of the ordinary course of business exception is met, meaning that the equipment used to intercept the communication satisfied the requirements for the exception, it nevertheless is not within the ordinary course of business for one spouse to "spy" on the other. *See, e.g., United States v. Murdock*, 63 F3d 1391, 1400 (6th Cir 1995), *cert den* 116 S Ct 1672 (1996). *See also Kratz v. Kratz*, 477 F Supp 463, 474 (ED Pa 1979) ("This isolated statement by a witness at a congressional hearing does not warrant the contention that Congress

---

[7] It was Professor Schwartz who stated, as referred to by the majority, 156 Or App at 586: "I take it nobody wants to make it a crime for a father to listen in on his teenage daughter[.]"

[8] That introduction provides:

"Title III prohibits all wiretapping and electronic surveillance *by persons other than duly authorized law enforcement officials* engaged in the investigation of specified types of major crimes after obtaining a court order, *with exceptions provided for interceptions by employees of communications facilities whose normal course of employment would make necessary such interception, personnel of the Federal Communications Commission in the normal course of employment, and Government agents to secure information under the powers of the President to protect the Nation against actual or potential attack, or to otherwise protect the national security.*"

S Rep No 1097, 90th Cong, 2d Sess (1968), *reprinted in* 1968 USCCAN 2113 (emphasis added).

viewed husbands and wives as less than full equals before the law, or that Congress meant to abstain from prohibiting certain wrongs done by one spouse to the other."). Although many of the decisions say little more than is absolutely necessary to dispose of the notion that the exception applies to interspousal wiretapping, my reading of those decisions leads me to conclude that the unifying principle underlying them all is that it is not in the ordinary course of any household's business for the adult members of the household to intercept or record each other's telephone conversations.

That conclusion is in keeping with court decisions involving commercial businesses in which employers have intercepted employee conversations. In those decisions, the underlying principle appears to be that the employer must have more than an interest in knowing what employees are doing or discussing—the interest must be tied to legitimate business concerns. For example, even though an employer might be interested in knowing whether an employee is looking for other employment, the employer has no *legal* interest in those plans if the employee is at liberty to resign at will and therefore is not justified in intercepting a conversation regarding those plans. *Watkins v. L.M. Berry & Co.*, 704 F2d 577, 582 (11th Cir 1983); *cf. Briggs v. American Air Filter Co.*, 630 F2d at 420 (employer had legitimate business interest in discovering whether employee was disclosing business secrets to competitors after employee had been warned not to disclose such secrets). Applying the same reasoning to households, it becomes clear that, where the family member doing the eavesdropping has no specific *legal* interest or obligation regarding the person whose conversations are being intercepted, the eavesdropping should not be considered to be within the ordinary course of business. Accordingly, because spouses have no *legal* interest in controlling or monitoring each other's activities, eavesdropping on each other's telephone conversations cannot be considered within the ordinary course of their business.

With that understanding of the exception, I turn to the issue of parental wiretapping of children's conversations. The majority relies on three cases in which federal circuits have concluded that section 2510(5)(a)(i) allows parents to

intercept and record their children's telephone conversations—*Anonymous; Newcomb v. Ingle*, 944 F2d 1534 (10th Cir 1991), *cert den* 502 US 1044 (1992); and *Scheib v. Grant*, 22 F3d 149, 151 (7th Cir), *cert den* 115 S Ct 320 (1994). In *Anonymous*, which involved a custody dispute, the father used a telephone answering machine to record his eight-year-old daughter's telephone conversations with her mother.[9] In holding that Congress had explicitly exempted the father's actions from Title III's prohibitions, the court in *Anonymous* seized on Professor Schwartz's comment.[10] On the basis of that comment, the court concluded that the ordinary course of business exception applied to those cases in which a parent eavesdrops on a child. *Anonymous*, 558 F2d at 678. The fact that the parent recorded the child's conversation was, in the words of the court, "a distinction without a difference." *Id.* The court finally concluded that the facts in the case presented "a purely domestic conflict—a dispute between a wife and her ex-husband over the custody of their children—a matter clearly to be handled by the state courts." *Id.* at 679. That conclusion, however, had less to do with any analysis of the specific exception found in section 2510(5)(a)(i) than with the notion that Congress did not intend for Title III to reach domestic relations.

In *Newcomb*, a child brought a Title III action against his mother and his grandfather. The defendants had recorded telephone conversations that the child had had with his father, including one in which the father had instructed the child over the telephone as the child and his brother set fire to their mother's house. The tapes were turned over to the state, and the father was prosecuted and convicted for his acts and his parental rights were terminated. Further, the child was designated a child in need of care by the state. Upon reaching majority, the child sued his mother and

---

[9] Although the court initially approached the issue as one of interspousal wiretapping, 558 F2d at 677, its decision has been cited for the proposition that parent-child wiretapping is not covered by Title III. *See, e.g., Scheib*, 22 F3d at 151 (citing *Anonymous* for proposition that a custodial parent may tape a minor child's telephone conversations).

[10] *See* note 8.

grandfather, alleging violations of Title III.[11] The court concluded that "[i]nterception of a family member's telephone conversation by use of an extension phone in the family home is arguably permitted by a broad reading of the exemption contained in 18 USC § 2510(5)(a)(i)." *Newcomb*, 944 F2d at 1536. The court said that there was no persuasive reason why Congress would exempt a business extension and not one in the home, and it went on to conclude that the difference between listening in on the extension and tapping the line was immaterial in the context of that case. *Id*. A few months later, another panel of the same court concluded that the exception did *not* apply to interspousal wiretapping, but it reaffirmed the application of the exception to parent-child wiretapping. *Heggy v. Heggy*, 944 F2d 1537, 1538 n 1, *cert den* 503 US 951 (10th Cir 1991).[12] Finally, in *Scheib*, the court concluded that the ordinary course of business exception applied to the business of raising one's children, because parents who listen in on their minor children's telephone conversations out of concern for the well-being of their children should not be penalized.

Although I understand the appeal that such an interpretation of the statutory language might have to a federal court eager to avoid becoming involved in the decidedly messy area of familial conflicts, I must conclude that those courts were too quick to assert that the exception for interceptions made in the ordinary course of business applied, *as a matter of law*, to all cases in which a parent has intercepted his or her child's conversations. Moreover, there are a number of problems and inconsistencies with the above decisions, not the least of which is the assertion in *Newcomb* that there is no material distinction between listening in on an extension and placing a tap on the telephone wiring.[13] Nevertheless, although I am not fully persuaded by those decisions, I

---

[11] The court first distinguished the action from one involving spouses, stating that interspousal wiretapping was "qualitatively different from a custodial parent tapping a minor child's conversations within the family home." The court did not offer any explanation as to the nature of that "qualitative difference."

[12] Neither *Newcomb* nor *Heggy* attempted to distinguish or, for that matter, mentioned another Tenth Circuit decision, *United States v. Harpel*, 493 F2d 346 (10th Cir 1974), in which the court had held that, *as a matter of law*, surreptitious interception and recording of a telephone conversation over an extension telephone without authorization or consent is never within the ordinary course of business.

[13] *See People v. Otto*, 831 P2d 1178, 1189-90 (Cal), *cert den* 506 US 956 (1992):

will assume for the sake of this dissent that they stand for the general principle that a parent's "business" is to care for a minor child and that, therefore, in the ordinary course of that business, a parent is entitled to listen in to conversations that may concern the parent's legal obligations toward that child.

My examination of the case law and legislative history relating to the "ordinary course of business" exception and the general purposes of Title III leads me to the following conclusions. First, Congress did not intend to abstain from entering the arena of domestic relations, at least insofar as it sought to prevent the unauthorized interception of telephone conversations. Second, there is no room in Title III for implied exceptions—the only exceptions to the prohibition against unauthorized interception of telephone conversations are those specifically listed in the statute. Third, and finally, the "ordinary course of business" exception is limited to those interceptions necessary to further a legal interest that the eavesdropper has in knowing the contents of the intercepted conversation for purposes of the eavesdropper's business. I now apply these principles to the facts of this case.

I acknowledge that a parent has certain legal responsibilities for minor children,[14] and I can see how the ordinary course of business exception might be understood to allow for parental interception of a child's telephone conversations when those legal responsibilities are at issue, provided the method of interception fits within the strictures of section 2510(5)(a)(i)—that is, the equipment used must fit the description.[15] In this case, however, the child in question

---

"The differences between casually overhearing part of a conversation on an extension phone and intentionally wiretapping all incoming and outgoing calls are substantial: the former requires the physical presence of the eavesdropper, which inherently limits the extent and frequency of the invasion; the latter, by contrast, requires no supervision, is of potentially unlimited duration, and is wholly indiscriminate."

[14] Among other responsibilities, a parent has the duty to prevent exposure of a minor child to controlled substances, ORS 163.547, and to prevent a child under the age of 15 from committing an act that would bring the child within the jurisdiction of the juvenile court, ORS 163.577.

[15] Although the facts do not specify whether Clark used equipment fitting the statutory definition, defendant has not raised that issue as part of his challenge to the application of the exception. Therefore, for the sake of this dissent, I assume that Clark used equipment that would pass muster under the statute.

was an adult. Although a parent may care about the activities of a child, no matter what that child's age, once a child reaches majority the parent no longer has the same legal responsibilities, even if the child remains in the parent's home.[16] Although clearly concerned for her son's well-being, Clark had no legal responsibility for her son's behavior or any legal obligation to protect him from harm. Her interception of his telephone conversations could not be for the purposes of furthering her legal interests. Consequently, her interception of the conversation cannot be considered to be in the ordinary course of business. Accordingly, I conclude that, even if the exception set out in section 2510(5)(a)(i) could be read to allow a parent to intercept or record a minor child's telephone conversations, it does not apply to this case.

Although the majority concludes that Clark acted appropriately when she taped her son's telephone conversation, it also concludes that even if she *did* violate Title III, the evidence obtained as a result of that violation is nevertheless admissible because the police were not involved in the unlawful interception. In support of that conclusion, the majority relies on cases applying Fourth Amendment exclusionary rule analysis to Title III.

The exclusion of evidence as a remedy for Fourth Amendment violations was first recognized in *Weeks v. United States*, 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914). Since that decision, numerous changes have been made in that judicially created rule, with the result that illegally seized evidence may be admissible in court if exclusion of the evidence would not further the purposes of the Fourth Amendment. *See United States v. Leon*, 468 US 897, 906-10, 104 S Ct 3405, 82 L Ed 2d 677 (1984). The majority concludes that section 2515 was intended to be congruent with the Fourth Amendment's exclusionary rule and, hence, must be

---

[16] I recognize that many parents of adult children living at home may wish those children to abide by parental mandates—the phrase "If you are going to live in my house, you are going to live by my rules" springs to mind—but that desire has no *legal* effect or expression. The same is true in cases of adult roommates or houseguests—although the roommate or host might be concerned about illegal or dangerous activity, that concern does not translate into a right to eavesdrop on telephone conversations.

evaluated in light of Supreme Court changes to the exclusionary rule since section 2515 was enacted. As support for its argument, the majority relies on *dictum* in *Scott v. United States*, 436 US 128, 139, 98 S Ct 1717, 56 L Ed 2d 168 (1978), in which the Court, referring to Title III's legislative history, stated that section 2515 "was not intended 'generally to press the scope of the suppression law beyond present search and seizure law.'"

To the extent that the majority suggests that *Scott* stands for the proposition that all Title III violations should be analyzed as if they were Fourth Amendment violations, I conclude that that reading is incorrect. Rather, I read *Scott* to mean that, just as the exclusionary rule laid down in *Weeks* must be applied to further the purposes of the Fourth Amendment, so the exclusionary language of section 2515 must be interpreted to further the purposes of Title III. Occasionally the purposes of Title III and the Fourth Amendment may intersect and, in those instances, it may turn out that suppressing the challenged evidence would not further the purposes of either the constitutional or statutory protection against the interception of communications. In that instance, it might be proper to admit the evidence, even though the plain language of section 2515 would appear to call for its exclusion. I do not read *Scott's* statement about the relationship between Title III and the Fourth Amendment to mean that, in *all* Title III cases involving the government, the Fourth Amendment provides the *only* suppression remedy and that suppression is required only when the Fourth Amendment would require it. Such a reading would fly in the face of the language of the statute itself and of other Supreme Court cases interpreting the statute.

The Fourth Amendment's exclusionary rule is a "judicially fashioned doctrine aimed at deterring violations of Fourth Amendment rights." *United States v. Giordano*, 416 US 505, 524, 94 S Ct 1820, 40 L Ed 2d 341 (1974). Because the Fourth Amendment applies only to governmental action, the exclusionary rule is invoked only when it would deter governmental actors from violating the Fourth Amendment's privacy protections. Accordingly, when the state is the recipient of illegally obtained information but is not itself involved in procuring the information, excluding the information would have no deterrent effect on the state. Consequently,

the purpose of the exclusionary rule would not be served by suppressing the evidence.[17] Title III is, however, far more expansive than the Fourth Amendment. By its terms it applies to all actors, public or private, and applies not only to the seizure of evidence but to the further use or disclosure of that evidence. As one federal court has explained:

> "[U]nder Title III, unlike the Fourth Amendment, the invasion of privacy is not simply 'over and done with' when an unlawful intrusion has been affected. Rather, the disclosure or use of information obtained through such an intrusion amounts to a separate injury to the victim's privacy interest. * * * Section 2515—beyond serving the traditional exclusionary function of deterring further unlawful interceptions—also plays a role in protecting against the use or disclosure of communications that have been illegally seized."

*United States v. Dorfman*, 690 F2d 1217, 1228 (7th Cir 1982). It is clear from the statutory language and the case law interpreting it that Title III has as its purpose not only deterrence but also punishment and protection. Hence, a simplistic application of the Fourth Amendment's deterrence analysis is inappropriate.[18]

In *Gelbard v. United States*, 408 US 41, 92 S Ct 2357, 33 L Ed 2d 179 (1972), the Supreme Court examined section 2515 in light of Title III's legislative history[19] and concluded that

---

[17] *See, for example, Otto*, 831 P2d at 1194:

"The primary purpose of the Fourth Amendment exclusionary rule is the deterrence of unreasonable searches and seizures in violation of the Constitution, a purpose which clearly would not be furthered by penalizing the police for a private violation."

[18] The language of section 2515 further supports my conclusion that Title III imposes a greater restriction on the admissibility of evidence than does the Fourth Amendment's exclusionary rule. By its terms, section 2515 prohibits the use of the illegally intercepted communication as evidence in

"any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof."

That prohibition goes well beyond the current reach of the exclusionary rule, which has been held not to apply to, among others, grand jury or civil proceedings. *See United States v. Calandra*, 414 US 338, 94 S Ct 613, 38 L Ed 2d 561 (1974); *United States v. Janis*, 428 US 433, 96 S Ct 3021, 49 L Ed 2d 1046 (1976).

[19] Because the language of section 2515 is quite clear and precise, it would seem that an examination of its legislative history is unnecessary. *See, e.g., United*

"[t]he unequivocal language of § 2515 expresses the fundamental policy adopted by Congress on the subject of wiretapping and electronic surveillance. As the congressional findings for Title III make plain, that policy is strictly to limit the employment of those techniques of acquiring information[.]

"* * * * *

"Hence, although Title III authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern. Indeed, the congressional findings articulate clearly the intent to utilize the evidentiary prohibition of § 2515 to enforce the limitations imposed by Title III upon wiretapping and electronic surveillance[.]"

408 US at 47-49. Those limitations included the prohibition of "any unauthorized interception * * * and *the use of the contents thereof in evidence in court and administrative proceedings." Id.* at 49 (emphasis in original). The Court declared that section 2515's importance as a protection for the victim of an unlawful invasion of privacy could not be more clear, and further stated that section 2515

"serves not only to protect the privacy of communications, but also *to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also 'to protect the integrity of the court and administrative proceedings.'* "

*Id.* at 50-51 (emphasis added). Specifically, the court in *Gelbard* noted that, unlike an illegal search, the invasion of privacy caused by a Title III violation continues on after the initial interception:

"Contrary to the Government's assertion that the invasion of privacy is over and done with, [the use of the intercepted communication] compounds the statutorily proscribed invasion of * * * privacy by adding to the injury of the interception the insult of * * * disclosure. And, of course, Title III makes illegal not only unauthorized interceptions, *but also the disclosure and use of information obtained through such interceptions."*

---

*States v. Oregon*, 366 US 643, 648, 81 S Ct 1278, 1281, 6 L Ed 2d 575 (1961). However, because the Supreme Court has focused on the legislative history of Title III in interpreting its provisions, I refer to that history as well.

*Id.* (emphasis added).

I can imagine that there could be instances where, even though Title III has been violated, neither the purposes of Title III nor of the Fourth Amendment would be served by suppressing evidence obtained as a result of the violation. Take, for example, the situation presented in *Scott*. In that case, as part of a narcotics investigation, the government had court authorization to intercept calls made on a specific telephone line. The authorization required the agents to minimize the interception of calls not related to the investigation. The agents intercepted virtually all of the conversations that took place on the line, only 40 percent of which were related to the authorized narcotics investigation. The defendants moved to suppress all of the evidence from the wiretap, including those conversations that the agents had been authorized to intercept. The Supreme Court concluded that the agents had not violated Title III and so did not reach the question of suppression, except in *dictum*. The government had argued, however, that, even if the agents had violated Title III by failing to minimize their intrusion, only those conversations that were not related to the authorization should be suppressed. Assuming that the Fourth Amendment would not have barred the use of the authorized interceptions, the purposes of Title III arguably would be served by allowing the use of the authorized interceptions while suppressing evidence of the unrelated conversations, because that application of section 2515 would permit no further invasion of privacy than had been authorized.[20] However, when there has been no authorization to intercept communications, any disclosure of any intercepted conversation would be a further invasion of privacy.[21]

---

[20] I note, however, that the authors of a leading treatise on the subject of electronic surveillance reject that solution, reasoning that it leaves a defendant with no real remedy and strips the minimization provision of any deterrent effect. Fishman & McKenna, above, § 23:36, at 23-92 to 23-93. The authors conclude that "the better view is that when monitors blatantly disregard [the extent of their authority,] all conversations, pertinent and non-pertinent, must be suppressed." *Id.*; *cf. State v. Tucker*, 62 Or App 512, 521-22, 662 P2d 345 (1983) (police disregard of minimization provision in state statute required suppression of all intercepted communications).

[21] I further note that *Scott* has not been cited by any of the leading authorities on electronic surveillance for the principle that Fourth Amendment standards

Given that background, I conclude that the state's "clean hands" argument is unavailing. Although the police did not participate in Clark's interception of her son's telephone conversations, the use of those intercepted conversations by the state would further the invasion of privacy begun by Clark. Moreover, a "clean hands" exception disregards the express prohibitions in 18 USC § 2511(c) against intentional disclosure and in 18 USC § 2511(d) against intentional use of information obtained by means of unlawful interception of communications:

> "Congress sought to protect individual privacy by banning all surreptitious wiretapping [and] that goal requires the suppression of the fruits of an illegal intercept regardless of whether the perpetrator is a party to the litigation or a disinterested third party."

*Otto*, 831 P2d at 1194. Excluding the evidence of the recording would further the purposes of Title III by preventing the disclosure of the illegally intercepted conversations and by preventing courts from becoming a party to illegal conduct. *See Gelbard*, 408 US at 51.

I find support for my conclusion in the decisions of several federal courts, which, although not binding on this court, are persuasive in their interpretation of the federal statute. *See, e.g., Chandler v. United States Army*, 125 F3d 1296 (9th Cir 1997) (rejecting argument that government is free to use illegally intercepted communications as long as it did not participate in their interception); *In re Grand Jury*, 111 F3d 1066 (3d Cir 1997) (same); *United States v. Vest*, 813 F2d 477 (1st Cir 1987) (same). *But see Murdock*, 63 F3d at 1403 (construing section 2515 to apply only to cases where the actual interceptor seeks to use the information against the victim of the interception). In conclusion, I agree with the court in *Vest*, which held that to allow a state to use illegally

---

alone control the exclusionary effect of section 2515. Indeed, such a reading of *Scott* would require us to assume that the Supreme Court intended to overrule or qualify its earlier decisions in *Gelbard* and *United States v. Giordano*, 416 US 505, 94 S Ct 1820, 40 L Ed 2d 341 (1974), an assumption that we should decline to make on the basis of a single sentence that had no effect on the outcome of the case. Consequently, I conclude that the *dictum* in *Scott* as to the extent of the suppression remedy under section 2515 is not controlling.

obtained communications against a defendant would eviscerate the statutory protection of private communications against intrusion by unlawful interception. 813 F2d at 481.

For the reasons expressed, I dissent.