Argued and submitted September 22, 2006, affirmed June 27, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KEVIN MICHAEL KAYFES,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR030050; A126456

162 P3d 308

John Henry Hingson III argued the cause for appellant. With him on the brief was Jesse Wm. Barton.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant, a former middle-school teacher, appeals his convictions for three counts of rape in the third degree, ORS 163.355, three counts of sodomy in the third degree, ORS 163.385, and three counts of sexual abuse in the third degree, ORS 163.415, arising out of a sexual relationship with one of his students, K. Although she admitted sexual conduct with defendant to the police and others, K refused to testify at trial, and defendant assigns error to the trial court's admission of other evidence of the sexual nature of their relationship, specifically 12 audiotapes of telephone conversations between defendant and K, a videotape of K's interview with police, and a grand jury clerk's testimony recounting what K told the grand jury that indicted defendant. We conclude that the trial court erred by admitting the videotape and the grand jury clerk's testimony over defendant's hearsay objections, but that there was little likelihood that the errors affected the jury's verdict. Accordingly, we affirm.

We take the relevant facts from the record. When K was a 14-year-old seventh grader during the 1999-2000 school year, she served as defendant's teacher's aide. In the summer between her seventh- and eighth-grade years, K joined a traveling basketball team coached by defendant. In the fall of 2000, she enrolled in defendant's eighth-grade algebra class and joined the eighth-grade school basketball team coached by defendant. K continued to play on the traveling basketball team during the summer after eighth grade.

Defendant and K developed a relationship outside of the basketball teams and the classroom that K's mother described during her trial testimony as "friendly." K's mother permitted K, when K was in middle school, to visit defendant at his home and occasionally housesit for him. A witness observed K at defendant's house on average once a week during her eighth-grade year. One of K's classmates testified that K also sat in on defendant's math classes that year, even though she was not enrolled.

Defendant's neighbor described once coming home for lunch during the summer after K graduated from middle

school and seeing K "talking on a cell phone and kind of suspicious acting" across the street from defendant's house. She thought that "something[ was] going on," so she alerted her daughters to keep watch over defendant's house, and that same evening her older daughter saw K crawl over defendant's fence into his backyard. Although the neighbor reported what her daughter had seen to a school board official, no one investigated.

In fall 2001, when K was a high school freshman, however, police investigated defendant after a student told a school counselor that "[t]he whole thought of a teacher and a student just didn't seem right." That student was concerned about the relationship between defendant and K based on "observations and word of mouth." The police spoke to K's mother, who told them that she did not think anything inappropriate was happening between K and defendant. K's mother testified that, although she sometimes felt that something was "not quite right" about defendant's interactions with K, she did not think anything romantic was going on between them at that time.

The police closed the investigation, but K's mother asked defendant to stop contacting K outside of the traveling basketball team that defendant coached. The principal of the middle school at which defendant taught also talked to defendant about a report from a counselor that K had told another student that she was having a sexual relationship with defendant. Defendant denied that he was sexually involved with K, but the principal nevertheless instructed him to refrain from having contact with her. K's high school basketball coach testified, however, that defendant attended nearly all of K's home games during her freshman and sophomore years.

Shortly after the investigation was closed, in October 2001, K's mother became suspicious of the relationship between defendant and K because she discovered birth control pills with K's name and defendant's address on the label. When she confronted K, K claimed that the pills were dispensed to a friend, and that K had suggested that the friend use K's name and defendant's address. Although K told her mother that the pills were for someone else, several

of the pills were missing from the pack when K's mother confiscated them from K.

In fall 2002, when K was a 16-year-old high school sophomore, K's mother and her husband noticed that they were receiving multiple telephone calls each day in which the caller would hang up after they answered. They obtained caller identification and discovered that many of the calls were from defendant, so they installed a device to secretly record K's telephone conversations.

K's mother recorded several phone calls between defendant and K in January 2003. During the first recorded conversation, K commented that she could not believe that she and defendant had had sex on every piece of furniture in his house, and defendant affirmatively acknowledged K's remark. Although most of the phone calls centered around the interpersonal dynamics of K's basketball team and her conflicts with the coach and other players, the romantic overtones of the conversations are unmistakable. K told defendant that he "looked so good," and she discussed preparing to see him by doing her hair and wearing scented lotion. At one point, K read defendant a love poem that she had written for him, and K and defendant professed their love for one another on multiple occasions. A large portion of their conversations was devoted to discussing how they might arrange to meet without defendant's roommate or K's mother knowing, and they expressed disappointment when their plans were thwarted. K and defendant also discussed whether K's mother knew about the phone calls and took steps to avoid both defendant's roommate and K's mother finding out that they were talking to each other.

After recording several calls between K and defendant, K's mother turned the tapes over to the police. On January 9, 2003, the police interviewed K at her home, but she denied having a sexual relationship with defendant. Later that evening, K's mother recorded another phone call in which K told defendant that the police had interviewed her. K and defendant discussed what K had told the officers in an effort to give them a consistent account of events when defendant was contacted by police. They agreed that, if police asked defendant if K was ever at his home alone, defendant

would say that K came by alone a few days before Christmas to drop off some cards, but that she did not go inside.

When the police interviewed defendant on January 13, 2003, he denied having a sexual relationship with K and, and as he and K had agreed, he claimed that he had last seen K a few days before Christmas when she delivered some Christmas cards to his house. Although he initially denied any knowledge of the birth control pills K's mother found in K's bag, he later admitted that he did know about the pills, but he denied that they were for K's use. Rather, he claimed that K's boyfriend at the time took her to the clinic to obtain the pills for a friend, but that he had known that K intended to use his address to obtain the prescription.

Later that day, K was questioned in a videotaped interview at the police station by two detectives. After initially denying the sexual nature of their relationship, when pressed, K admitted that she and defendant had been sexually involved but that they had not engaged in sexual activity for "quite a while." K explained that she and defendant had grown emotionally close during her eighth-grade year, and that they first shared a kiss in January 2001, and that they engaged in mutual oral sex in February 2001. She told the detectives that she and defendant had oral sex between 10 and 15 times since then. K also told detectives that she and defendant had intercourse later in February 2001, and then about once a month for the next year and a half. Each encounter occurred at defendant's house. After her interview, K called defendant and, in another conversation taped by her mother, recounted what she had told police, including that the police "knew we had kissed, and they knew that we had had sex at least five times, and they had known that we had had oral sex at least ten times." Defendant asked K, "How did they know this?" and K replied, "I don't know, I. My guess is they tapped the phone. And so I just, so I just told them."

That afternoon, defendant's roommate called K and told her to call defendant. When they spoke, on another audiotaped call, defendant told K that he had intentionally overdosed on aspirin. Defendant told K that he could not go to jail, and K said, "[I]f you can't do this, I can't do this. And I am gonna be right there with you." After the call concluded, K

intentionally overdosed on ibuprofen. She became ill at basketball practice that afternoon. She explained to her mother, who attended the practice, that she had taken some pills, and her mother decided to take her to the emergency room. Defendant also decided to seek emergency medical treatment.

The same emergency-room doctor treated both K and defendant. That physician testified that defendant was "[v]ery despondent about having been caught having had a sexual affair with an underage woman." Defendant admitted the "sexual relationship" to the doctor, but "without any specific details." Defendant also told the doctor that, before coming to the hospital, he had called K's mother to apologize. Defendant acknowledged to the doctor that his relationship with K "had progressed at least as far as a sexual relationship, and he understood his teaching career had ended. His coaching career had ended." The doctor also testified that, during his treatment of K, she "had ample opportunity to deny that it had been sexual, and that didn't occur. It was kind of like it was understood." He testified without objection that K's mother told him that K and defendant had a "suicide pact."

Several days later, according to the grand jury clerk's testimony, K testified before the grand jury that she and defendant had begun a sexual relationship in February 2001 with mutual oral sex, and that later that same month she and defendant first had sexual intercourse. K told the grand jury that defendant had helped her obtain birth control. She also explained that she called defendant and told him what she had told the police.

K recovered from her suicide attempt and returned to school, where she spoke to her basketball coach about her feelings for defendant. K told the coach "that she cared very much about him, that she didn't know what she was going to do without being able to contact him and compared it to me not being [allowed] to have contact with my husband." K also told a friend that "she loves [defendant] and that she's worried about what was going to happen" and that she and defendant "were like soul mates."

When called as a witness at defendant's trial, K refused to testify and invoked her right to be free from self-incrimination. Although the court granted her immunity, K continued to refuse to testify and was held in contempt. *See* ORS 33.015(2); ORS 33.085.

Although K never testified at trial, the state introduced other evidence of the sexual nature of K's relationship with defendant, including the testimony of the emergency room doctor, evidence of K's possession of birth control pills with K's name and defendant's address on the label, the 12 audiotapes that K's mother had made of defendant's conversations with K, the videotape of defendant's interview with police, the videotape of K's interview with police, and K's grand jury testimony as recounted by the clerk of the grand jury.

At trial, defendant objected to the admission of the audiotapes of his telephone conversations with K, arguing that they were inadmissible pursuant to 18 USC section 2515, which prohibits the use of illegally intercepted wire communications in court proceedings. He acknowledged to the trial court that the audiotapes were admissible under *State v. Capell*, 156 Or App 582, 966 P2d 232 (1998), but he argued that *Capell* was wrongly decided. The trial court denied defendant's motion to suppress the audiotapes.

Defendant also argued both that the videotape of K's interview with police and the testimony of the grand jury clerk were inadmissible hearsay, and that their admission would violate his rights to confront witnesses against him under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. The state argued that the evidence should be admitted over defendant's hearsay and state and federal confrontation-clause objections because defendant had forfeited those objections due to the wrongful nature of his conduct towards K. *See, e.g., State v. Mack*, 337 Or 586, 592 n 8, 101 P3d 349 (2004); *State v. Page*, 197 Or App 72, 80-81, 104 P3d 616 (2005) (both recognizing the common-law doctrine known as "forfeiture by wrongdoing").

The trial court concluded both that K's statements on the police videotape and as recounted by the grand jury

clerk were admissible under the residual hearsay exception, *former* OEC 804(3)(f) (2003), *renumbered as* OEC 804(3)(h) (2005),[1] and that defendant had forfeited his rights to confront K under both the Oregon Constitution and the United States Constitution. Noting that K was a "particularly fragile child as a result of other traumatic events which had occurred in her life" and who "placed enormous trust and confidence in [defendant]," the court reasoned that defendant had manipulated K into refusing to testify. The jury convicted defendant on all counts.

■ The first assignment of error pertains to the admission of the 12 audiotapes made by K's mother. On appeal, defendant argues that *Capell* should be overturned.[2] We disagree, and we reject defendant's first assignment of error without further discussion.

■ Defendant's second and third assignments of error concern the admission of statements that K made during her videotaped police interview and to the grand jury, respectively. We first consider whether K's statements were properly admitted under OEC 804(3)(f). We review the trial court's decision to admit the evidence for legal error. *See*

---

[1] This action was commenced before the effective date of the 2005 revisions to the Oregon Evidence Code. All subsequent references to provisions of the Oregon Evidence Code refer to the 2003 version of those statutes unless otherwise noted.

[2] Defendant also argues on appeal that *Capell* is distinguishable on its facts from this case. At trial, he argued that K's mother was acting on behalf of the state when she recorded the conversations, and that therefore the audiotapes were subject to the exclusionary rule. Nevertheless, he candidly told the trial court that

> "the Court of Appeals has resolved this issue [the state-actor issue] squarely against me. I believe that the Court of Appeals was in error, and in the event that we're ever in a position to ask them to overturn its decision, have the Oregon Supreme Court do that. This—the purpose of this exercise is to make a record so that we don't waive anything. But I should lose it according to the state of the law as exists."

Pursuant to the argument presented by defendant, the trial court's order denying defendant's motion to suppress focused entirely on whether K's mother "act[ed] on behalf of, or act[ed] as an agent, of the state" when she recorded the calls. We conclude that, under such circumstances, defendant did not preserve at trial the issue of whether *Capell* is distinguishable, and we do not consider it on appeal. ORAP 5.45(4); *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."); *id.* at 344-46 (appellate courts have an independent obligation to determine whether an argument advanced on appeal was preserved at trial).

*State v. Nielsen,* 316 Or 611, 618, 853 P2d 256 (1993) (explaining that we consider statutory questions before constitutional claims); *State v. Rodriguez-Castillo,* 210 Or App 479, 488, 151 P3d 931 (2007) ("We review for errors of law the trial court's legal conclusion as to whether the statement is admissible under an exception to the hearsay rule."). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801. It is inadmissible unless it falls within one of the exceptions set out in OEC 801 to 806 or as "otherwise provided by law." OEC 802.

Defendant contends that the trial court erred by applying OEC 804(3)(f) to K's statements because those statements are "specifically covered" by another exception, namely, OEC 803(18a)(a). We agree. OEC 804(3)(f) applies only if a witness was unavailable and the statement to be admitted is

> *"not specifically covered by any of the foregoing exceptions* but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of the Oregon Evidence Code and the interests of justice will best be served by admission of the statement into evidence."

(Emphasis added.) The trial court specifically found that K's statement at the police station was "a statement not specifically covered by any of the previous portions of Rule 804, although it is covered in [Rule] 803." Nevertheless, the trial court reasoned that "since [K] is unavailable, that brings into play Rule 804, rather than [Rule] 803."[3]

The applicability of OEC 803(18a), however, is not limited to situations in which a declarant is available. *See State v. Campbell,* 299 Or 633, 702, 705 P2d 694 (1985) ("[T]he legislature, in placing OEC 803(18a) as an OEC 803

---

[3] The trial court apparently did not revisit this issue when ruling on the admissibility of K's statements to the grand jury as recounted by the grand jury clerk. Those statements were also "specifically covered" by OEC 803(18a) and thus, contrary to the trial court's conclusion, inadmissible under OEC 804(3)(f).

exception, must have decided that the availability * * * of the declarant [ ] was immaterial."). Thus, we must determine whether the videotaped police interview of K and the grand jury clerk's testimony fall within the category of statements "specifically covered by" OEC 803(18a). *State ex rel Children's Serv. Div. v. Page*, 66 Or App 535, 539, 647 P2d 1196 (1984) ("[W]here there is a specific hearsay exception applicable to a clearly defined category of evidence * * *, but the evidence fails to satisfy the requirements of the specific exception, the evidence should not be admitted under the residual exception." (Internal quotation marks and citations omitted.)).

OEC 803(18a) provides, in relevant part:

"The following are not excluded by ORS 40.455, even though the declarant is available as a witness:

"* * * * *

"(18a)(a)   A complaint of sexual misconduct[ or a] complaint of abuse as defined in ORS 107.705 or 419B.005 * * * made by the witness after the commission of the alleged misconduct or abuse at issue. Except as provided in paragraph (b) of this subsection, such evidence must be confined to the fact that the complaint was made.

"(b)   A statement made by a person concerning an act of abuse as defined in ORS 107.705 or 419B.005 * * * is not excluded by ORS 40.455 if the declarant either testifies at the proceedings and is subject to cross examination, or is unavailable as a witness but was chronologically or mentally under 12 years of age when the statement was made * * *. However, if a declarant is unavailable, the statement may be admitted in evidence only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability, and in a criminal trial that there is corroborative evidence of the act of abuse and of the alleged perpetrator's opportunity to participate in the conduct and that the statement possesses indicia of reliability as is constitutionally required to be admitted."

OEC 803(18a) applies to statements made by the victim of a sex crime about that crime, including statements made by child victims, elderly victims, and developmentally disabled adults. OEC 803(18a)(d); *Campbell*, 299 Or at 641-46. In

*Page*, the state sought to admit the testimony of a child psychologist and caseworker narrating the details of a complaint of sexual misconduct allegedly made by the defendant's eight-year-old daughter. Although the psychologist and caseworker were permitted to testify that the daughter had made a complaint of sexual misconduct under OEC 803(18a)(a), OEC 803(18a)(b) prohibited the witnesses from describing the sexual misconduct. Thus, we held that the trial court erred by permitting the witnesses to testify under the residual hearsay exception about the details of what the daughter had told them because that evidence was specifically excluded by OEC 803(18a). 66 Or App at 540.

Here, defendant was charged with multiple counts of rape, sodomy, and sexual abuse as those acts are defined in ORS chapter 163. Therefore, K's statements to the police and to the grand jury inculpating defendant for those crimes fall within the "clearly defined category of evidence" covered by OEC 803(18a). *Page*, 66 Or App at 539 (internal quotation marks omitted); *see also* OEC 803(18a)(a) (permitting the admission of a hearsay statement that is "[a] complaint of sexual misconduct[ or a] complaint of abuse as defined in ORS * * * 419B.005 * * * made by the witness after the commission of the alleged misconduct or abuse at issue"); ORS 419B.005(1)(a) (defining "abuse" to include rape, sodomy, and sexual abuse as those acts are defined in ORS chapter 163).

Although both the police detectives who interviewed K and the grand jury clerk who recounted K's testimony would have been permitted under OEC 803(18a)(a) to testify "to the fact that the complaint was made," under the rule, their testimony should have been confined to that fact alone. The details of a complaint of sexual misconduct or abuse may not be admitted under OEC 803(18a) unless the witness is available or, if the witness is unavailable, "chronologically or mentally under 12 years of age when the statement was made." OEC 803(18a)(b). Because K was unavailable and 16 years of age at the time she made the statements to the police and to the grand jury, the details of her statements were not admissible under OEC 803(18a) or the residual exception of OEC 804(3)(f). *See Page*, 66 Or App at 540.

■    The state contends that the entirety of K's state-ments was nevertheless admissible because defendant for-feited his right to object on hearsay grounds by virtue of his wrongful relationship with K.[4] The common-law doctrine of forfeiture by wrongdoing rule bars a defendant from assert-ing the constitutional right to confront a declarant whom the defendant has caused to be absent from trial, and, in this case, is also being asserted by the state as an exception to the hearsay rule. *See Mack*, 337 Or at 592 n 8; *Page*, 197 Or App at 680-81. We need not decide whether the trial court cor-rectly applied the doctrine to overcome defendant's objection to the admission of K's statements to police and to the grand jury on hearsay or confrontation-clause grounds because we conclude that any error was harmless.

■    Evidentiary error is not presumed prejudicial, and the burden is on a defendant who appeals his conviction to show that a court's error affected a substantial right. *See* Or Const, Art VII (Amended), § 3; OEC 103(1); *State v. Torres*, 206 Or App 436, 445, 136 P3d 1132 (2006). An evidentiary error affects a defendant's substantial rights when, based on the totality of the record, the error affected the jury's verdict. If there is little likelihood that the error affected the jury's verdict, then the evidentiary error was harmless. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

■    To determine whether an error was harmless, we examine the record as a whole and consider the nature of the error and the context in which it occurred. *Torres*, 206 Or App at 445. For instance, if the erroneously admitted testimony is merely cumulative of other evidence that established the same fact, then the evidence is less likely to have affected the

---

[4] The state raised this contention to the trial court in response to both defen-dant's hearsay objections and his confrontation clause objections. Following defen-dant's trial, the legislature codified the common-law doctrine as OEC 804(3)(f) (2005) (applicable if a defendant causes the death, incapacity, or incompetence of witness) and OEC 804(3)(g) (2005) (applicable if a defendant otherwise wrongfully caused a witness to be unavailable) in the context of the rule against hearsay. Or Laws 2005, ch 458, § 1. Those amendments to OEC 804 "do not apply to an action or proceeding commenced before [January 1, 2006]." *Id.* § 2. This action was com-menced when defendant was indicted on January 22, 2003. *See* ORS 131.135 ("A prosecution is commenced when a warrant or other process is executed * * *."). Accordingly, we need not construe OEC 804(3)(g) (2005).

verdict. *See Davis*, 336 Or at 33-34. Similarly, the less substantial the evidence of guilt, the more likely it is that an error affected the result. *State v. Roller*, 201 Or App 166, 173, 118 P3d 804 (2005).

■ ■  Although under the Oregon Constitution a verdict must be affirmed if there is little likelihood that the error affected it, for violations of federal constitutional rights, the error must be harmless beyond a reasonable doubt. *See State v. Walton*, 311 Or 223, 231, 809 P2d 81 (1991). In determining whether an error is harmless beyond a reasonable doubt, we consider the importance of the improperly admitted testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and the overall strength of the prosecution's case. *State v. Cook*, 340 Or 530, 135 P3d 260 (2006) (quotation marks and citation omitted).

Viewing the record as a whole, we conclude that the errors were harmless under any standard because the evidence was cumulative and uncontradicted and there was other substantial evidence of defendant's guilt. After K had been interviewed at the police station, she told defendant over the phone that the police "knew that we had had sex at least five times, and they had known that we had had oral sex at least ten times." Thus, from the properly admitted audiotaped phone call, the jury heard K recount to defendant the substance of what she told police (and later the grand jury). The jury also heard the properly admitted audiotape of a phone call during which K told defendant, "Do you realize that there is not a piece of furniture in your house that I haven't had sex with you on?" Defendant replied, "Yep," thereby adopting K's statement. Moreover, the emergency room doctor who treated both K and defendant testified that defendant admitted that he and K had engaged in a "sexual affair."

Defendant's agreement that the 12 audiotaped conversations showed that defendant and K were romantically involved, as well as his argument that the jury should not rely on K's statements to police and the grand jury, further support our conclusion that the evidence was not likely to

have affected the jury's verdict. In closing, defendant's counsel argued to the jury that defendant and K "fell in love, and it was genuine love." Counsel also argued that the jury should question the reliability of K's statements to police because the officers did not follow the protocol for interviewing children when investigating cases of suspected child abuse, and that the jury should distrust the grand jury clerk's testimony because the state destroyed the notes of the other grand jurors.

In addition to the significant amount of direct evidence that K and defendant had engaged in intercourse and sodomy, there was substantial circumstantial evidence of defendant's guilt. Several witnesses testified that K and defendant were rumored to be sexually involved, and that their relationship "just didn't seem right." The jury also heard the telephone conversations between defendant and K, in which the romantic nature of those calls was unmistakable. During those calls, defendant and K often discussed their love for each other. They also discussed how they might meet in secret, and defendant's neighbor testified that she once saw K climb the fence into defendant's backyard, as if she were trying to avoid detection. The jury also heard K and defendant discuss how to keep their stories straight, and they viewed a videotape of defendant's police interview in which he repeated the story that he and K had agreed upon. Defendant himself admitted to police that he had played a role in assisting K to obtain birth control pills by allowing her to use his address. Although defendant claimed those pills were for K's friend, K's stepfather testified that several of the pills were missing when K's mother confiscated them from K. Lastly, the evidence established that K and defendant had entered into and attempted to carry out a "suicide pact." We conclude that there is little likelihood that the error in admitting K's statements to the grand jury and to the police affected the jury's verdict because those statements were cumulative of other evidence, there was no other evidence contradicting them, and there was substantial other evidence of defendant's guilt.

In his fourth, fifth, and sixth assignments of error, defendant argues that the trial court ran afoul of the Sixth Amendment, as interpreted in *Apprendi v. New Jersey*, 530

US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), when it imposed consecutive sentences, failed to merge his multiple convictions for the same offenses, and reconstituted his criminal history score. In *State v. Tanner*, 210 Or App 70, 86-87, 150 P3d 31 (2006), we considered whether imposition of consecutive sentences based on facts not found by a jury or admitted to by a defendant was unconstitutional under *Apprendi* and *Blakely*. We concluded that the jury-trial right of the Sixth Amendment of the United States Constitution did not extend to facts that concern the manner in which sentences for separate crimes should be served. Thus, the trial court did not err by imposing consecutive sentences on counts two and three after finding that each offense constituted a separate criminal episode. *See* ORS 131.123(2); *State v. Carson*, 211 Or App 606, 156 P3d 71 (2007) (applying *Tanner* to ORS 137.123(2)).

We also conclude that the trial court did not err by declining to merge defendant's convictions for multiple violations of the same statutory provision. The merger statute, ORS 161.067(3), requires merger of multiple violations of the same statutory provision involving a single victim only if the violations were committed during the same conduct or criminal episode. Here, the jury found that each criminal act was a "separate act" after being instructed by the trial judge that a "separate act" is "an act that does not arise from the same continuous and uninterrupted conduct as another act." Accordingly, the jury found that each offense constituted a separate criminal episode. *See* ORS 131.505(4) (defining "criminal episode" as "continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective"); *see also State v. Knight*, 160 Or App 395, 403, 981 P2d 819 (1999) ("The phrase 'same act or transaction' is synonymous with the term 'criminal episode.'" (citing *State v. Boyd*, 271 Or 558, 565-66, 533 P2d 795 (1975))). It follows that the trial court did not err by declining to merge defendant's convictions.

Based on the jury's finding that each offense constituted a separate criminal episode, we also conclude that the trial court did not err by reconstituting defendant's criminal

history score when imposing sentence on counts two and three. *See Knight*, 160 Or App at 403 ("[A] defendant's criminal history can be enhanced by a conviction based on a concurrently sentenced offense provided that the offenses do not arise from 'the same transaction or series of specifically connected transactions.' The phrase 'same act or transaction' is synonymous with the term 'criminal episode.' " (internal quotation marks omitted; citing *State v. Bucholz*, 317 Or 309, 315, 855 P2d 1100 (1993), and *Boyd*, 271 Or at 565-66)).

Affirmed.