Argued and submitted November 18, 2019, reversed and remanded June 9, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MERCEDES CELESTE ALVARADO,
*Defendant-Appellant.*

Marion County Circuit Court
14C46243; A167177

492 P3d 712

Defendant appeals from a judgment of conviction for first-degree manslaughter of her three-year-old daughter. This case is before the Court of Appeals for a second time; the first time the court remanded based on the trial court's failure to conduct OEC 403 balancing with respect to video evidence that was admitted at trial. Briefly, the video shows defendant's boyfriend acting domineering toward defendant's children, in defendant's presence, and shows him prompting defendant's daughter to repeat racial slurs, among other things. In this appeal, defendant argues that the trial court erroneously concluded that the challenged evidence was admissible under OEC 403 and, as a result, erred in not ordering a new trial on remand. *Held*: The trial court erred because, as a matter of law, the unfair prejudice of the video evidence substantially outweighed its slight probative value. That error was not harmless.

Reversed and remanded.

Dale Penn, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

Defendant appeals from a judgment of conviction for first-degree manslaughter. This case is before us a second time; the first time we remanded based on the trial court's failure to conduct OEC 403 balancing with respect to video evidence that was admitted at trial. *State v. Alvarado*, 288 Or App 752, 407 P3d 959 (2017). Briefly, the video at issue showed defendant "and her boyfriend, Elliott, interacting with her two children, one of whom is the decedent," and "depict[ed] Elliott prompting the children to use racial epithets and otherwise acting domineering." *Id.* at 753. In this appeal, defendant argues that the trial court erroneously concluded that the challenged evidence was admissible under OEC 403 and, as a result, erred in not ordering a new trial on remand. We conclude that the trial court erred because, as a matter of law, the unfair prejudice of the evidence substantially outweighed its slight probative value. That error was not harmless. Accordingly, we reverse and remand for a new trial.

We first set out, generally, the evidence introduced at trial, and then discuss more specifically the procedural facts relating to the evidence at issue here.

For about nine months, defendant and two of her children—her son, X, who was four years old, and her daughter, A, who was three years old and is the decedent in this case—lived with defendant's boyfriend, David Elliott. Defendant allowed Elliott to watch the children in her absence and to discipline them. Defendant stated that the discipline included "swats" on the butt and time out in the corner. She admitted that Elliot was stricter with the children than she was and would discipline them if "they weren't doing something right" or for things like peeing themselves. She also thought his punishments were excessive, including that his time-outs were too long and that he would swat or spank them too hard, and she had confronted him about that.

The events leading to A's death began on April 15, 2013. On that day, at about 5:00 a.m., defendant left for work while everyone still slept, and Elliott was in charge of the children while she was at work. Elliott reported that the

children seemed normal all morning. Defendant testified that, after she returned home around 2:30 p.m., the children were playing and acting normally. At about 7:30 or 8:00 p.m., defendant left for 30 to 45 minutes to get money from her mother and to buy cigarettes. Defendant and Elliott had been fighting and continued to quarrel via text message while she was out. Among those text messages was the following from Elliott to defendant:

> "You say I'm a piece of shit and don't do anything. I abuse your kids, I'm lazy, controlling. That's how you feel. That's why I'm leaving. Also, you play me out to be the bad guy to your kids all the time. I'll not turn that shit off. I'm just tired, not all the shit.
>
> "I really wanna disappear. Jail is probably the best place for me at this moment in my life. I think tomorrow I'm gonna find a way to Albany and turn myself in. That way, you have your space away from me and you won't have to deal with all the hassle of me."[1]

Defendant responded:

> "I just get mad when you hit them and treat them like they don't have feelings. And if you think that's what's best for you, then fine. Not much I can say or do to change your mind, so I won't bother trying to. And so you know, I never in my life would ever threaten someone with DHS or even tell someone who I love to stay out of a certain town or else they're gonna get beat up. That's pretty much what a certain douche bag used to tell me. I'm glad you found threatening me amusing. Obviously your feelings for me have changed from love to hate and I'm sorry you feel that way. But what you said was pretty harsh and makes me very sad to know I saw your true colors towards me. And even sadder because you're the same guy I chose to open my heart to after everything I've been through and you just broke it.
>
> "After tomorrow, if that's what you decide is to go your own way, then I promise you I won't make any problems whatsoever for you and I won't bother you ever again. It's literally gonna crush me inside, but I have to go by whatever

---

[1] The evidence at trial indicated that Elliott was likely suggesting that he would turn himself in on an outstanding warrant for his failure to appear in court on a driving under the influence of intoxicants charge.

you choose, even if that means I never see you again. And again, I'm sorry for not making you happy."

Shortly after that exchange, Elliott texted that A "just threw up everywhere." He gave her a bath to clean her up and, when defendant got home, A was just getting out of the bathtub. Defendant then made the children sandwiches, which they ate.

Around 4:00 a.m. the next day, April 16, X came into defendant's and Elliott's bedroom and told defendant that A had vomited. A complained that her stomach hurt. Defendant got up and cleaned A in the bathtub, and Elliott changed her bedding. A continued to have dry heaves in the bath, and defendant put her back in bed with a bucket next to the bed in case she vomited again.

At around 11:30 a.m. or noon, defendant woke up the children and noticed that there was vomit or mucus in the bucket. She made the children eggs and left them alone to eat, while she went into her bedroom to watch a video. Elliott reported that, at that point, A was acting sick and was not as active as normal. While eating her eggs, A vomited into her lap, and defendant asked Elliott to put A in the bathtub. He did so, then sat in a chair in their bedroom. The door to the bathroom was cracked open, but A could not be seen from the bedroom.

Defendant testified that she assumed that Elliott checked on A a couple of times because he left the room. She further testified that, after Elliott was in the room again for four or five minutes, she asked him to check on A while defendant continued to watch a video with headphones. After about two minutes, X came in and told defendant that Elliott had been yelling for her to come to the bathroom. Defendant found A lying on the bathroom floor with Elliott patting her back. He had found her face down in the bathtub and pulled her out and laid her on the floor. After A did not respond to defendant's voice, she called 9-1-1. That call was made at 1:50 p.m.

When paramedics arrived, A was lying on her side in the bathroom, unresponsive and breathing slowly. While on the way to the hospital with A, defendant texted Elliott after speaking to her mother:

"She said if they ask, we put her in, we went in room, and I told you to check on her. You did. And then X came in, saying you were screaming for me, so I went in . . . My mom said if they knew we left her alone and were in room, they could take all the kids away from us."

At Salem Hospital, A was intubated and stabilized for transport to Doernbecher Children's Hospital in Portland, where a CT scan of her body revealed a lacerated pancreas and two acute right rib fractures. A also suffered a brain injury from the drowning. By the morning of April 18, A was not showing signs of brain function and, on April 19, three days after her drowning, A was declared dead from her brain injury.

Dr. Valvano testified that, in his opinion, the pancreatic laceration and rib fractures were from abusive, inflicted trauma, and that A drowned as a result of negligent supervision. He explained that a direct blow to the abdomen could cause those injuries without causing obvious bruising on the skin. He also testified that A's vomiting was a symptom of developing pancreatitis from the injury, that it would have been painful, and that the pancreatic injury occurred shortly before the vomiting started, meaning sometime within the prior 48 hours. In Dr. Valvano's view, it was more likely that the pancreas injury and the rib fractures were from two separate impacts. Further, he opined that, "[g]iven the degree of pancreatic injury that she had, I would expect her to be very sick," and that she likely drowned "because she passed out from the pancreatic injury."

About six weeks before A's death, Elliott recorded a video on his phone of himself with defendant and the children. During the roughly 10 minutes of the video, Elliott can be heard but not seen. The video begins with Elliott recording defendant, after telling her that he is not recording her, while she is lying on her bed looking at her phone. Elliott and defendant discuss dinner and what defendant is looking at on her phone and both use profanity. After defendant realizes that Elliott is recording, the video closes in on defendant's cleavage while commenting on the size of her breasts, and Elliott makes other statements while laughing, including, "Are you going to get my food or what?" "Hurry up, ho," and "I'm gonna beat you in the face."

After about five minutes of their back and forth, Elliott calls in X and says to him, "What's up, nigger." Defendant is heard gasping at that statement. A follows behind X, and Elliott tells her to call X a "nigger," and she does so without hesitating. Elliott tells the children to wrestle, and they look confused, but defendant intervenes and says they do not do that and tells A to tell Elliott that she is a "lady" and does not wrestle. X then goes over to defendant, and Elliott records an interaction between himself and A. It starts with Elliott commanding A to come over to him instead of returning to play with her toys. She complies immediately. He then tries to get A to say "toys" correctly by saying the "t" sound and has her say the word repeatedly, until she does it. Elliott then has her parrot several statements for him, including that Elliott is "cool," A is a "beaner," defendant is a "beaner" and a "fishy beaner," and "we are fishy Mexicans." Defendant can be heard interacting with X in the background about whether X is white or Mexican. When defendant gets up to get dinner, Elliott has A tell defendant to "get my food, woman," "now," to respond "hell no" to a question from defendant, and to say "put it up your booty" and "now" while pointing at defendant. Defendant and Elliott both laugh at that interaction.

Before trial, the court held a hearing on the admissibility of the cell phone video at defendant's trial. The state asserted that the portion of the video that features only defendant and Elliott was relevant for two reasons: to rebut an anticipated defense that defendant was controlled by Elliott and to show the environment to which defendant exposed the children. The state argued that the portion of the video featuring the children was also relevant to show what A looked like, in particular her small stature, and her limited communication abilities, and to show that Elliott commanded the children. The court reserved ruling because much of the state's relevancy argument depended on what the evidence might show. The court also commented that, with regard to A's stature, "there are alternatives available, such as making a photo of one frame," and therefore did not consider that argument to be persuasive.

Near the end of the state's case, the trial court again addressed the admissibility of the video. The state argued

that the video was relevant to show "real world context [of] the treatment of \*\*\* Elliott towards these two children"; to rebut defendant's denials in interviews that Elliott used vulgarities to refer to the children; to show that Elliott and defendant used swear words around the children; to show that the children were afraid of Elliott; and to show A's stature and maturity level. Defendant questioned the relevance, but also argued that the video would not be helpful to the trier of fact, would be confusing to the jury, and was very prejudicial to defendant, because the racial slurs and Elliott's disrespect to defendant would cause the jury to "have a hard time being open-minded about all the other evidence if they see this."

The court admitted the video exhibit, stating:

"Well, I voiced my concern about the height and weight issue, that perhaps there could be alternatives.

"I will say as I've listened to the evidence now, there has been introduced evidence that the defendant believed that her children could be melodramatic and relating just interactions with Mr. Elliott and that there were fine relationships and interactions with the children.

"I am concerned that as—as I've listened to that information that was provided by the defendant concerning what was she aware of in the relationship between her children and Mr. Elliott, that this video does portray some of the characteristics—and certainly available to argument by both sides what is portrayed, but I did perceive what could be argued as fear and rote direction and obey—immediate obedience to directions and concern on the face of the children. Now, I think all of those issues are something that the jury could consider. And certainly both sides would be able to argue what they should consider from that exhibit. But I think it is highly relevant to the issue of whether or not there was a perceived risk that was disregarded or a risk that should have been perceived. Either way.

"At this time, I know the charge is manslaughter in the first degree, but the mental element has a variety of different definitions. And I've already seen at least proposed instructions that would relate to criminal negligence or the—what should have been perceived.

"And I think as I have now heard the evidence to this point in the trial, I would agree with the arguments

presented by the State that this Exhibit Number 111 would be relevant and would be appropriate on mental state issues of the defendant that the jury must decide in making a decision in this case.

"So I do agree that [exhibit] 111 is relevant, for all the reasons argued by the State, and particularly this issue of mental state of the defendant as it relates to the charges presently before the Court. So I will authorize the admission of [exhibit] 111."

The entire video was played for the jury.

At the close of the evidence, the state argued that the first-degree manslaughter charge against defendant "has nothing to do with why her daughter was gravely ill," did not "require that you find that the defendant knew her daughter had a lacerated pancreas" or that defendant was aware of that additional risk to A or of A's additional vulnerability. The state had not presented evidence that proved how A sustained the injuries to her pancreas and did not argue that defendant was aware of those specific injuries. The state did argue more generally, however, that defendant knew how Elliott interacted with and treated her children and knew that Elliott was hurting her children, specifically referring extensively to the video:

"And then you have the video, February 27th of 2013. You watched a video of exactly how *** Elliott treated the defendant's children. Of exactly what this defendant was aware of in terms of how *** Elliott talked to, interacted with, and treated her children.

"And every one of you can use your common sense and your life experience to determine whether those children looked afraid to you. A little three-year-old girl who is literally standing at attention, doing everything that *** Elliott tells her to do.

"And the defendant lays down on this bed as *** Elliott is encouraging her little daughter to call her brother a vile racial slur. And the defendant tells you yesterday when she testified, 'Well, I wasn't paying attention to the video. I was taking notes.'

"Well, if that's true, then let me make something very clear. She obviously is not capable of multitasking. She obviously isn't somebody who can do multiple things at

once, like have a sick child in the bathtub and do laundry at the same time and be doing all these other things.

"It's not true, obviously. She knows. She knows what *** Elliott called her kids. She knows about that video ***. She can sit up on the witness stand and lie to you about it, but she knows. And she knew exactly how he treated them every day."

On the other hand, the state also told the jury that the case was not about defendant's awareness of any injury to A. The state argued:

"This case is about the defendant being aware of the risk that her daughter would drown, consciously disregarding that risk, and leaving her child unattended in a bathtub for a period of time that would likely endanger her health or welfare. And the evidence in this case, absent evidence of her knowledge of that [pancreas] injury, proves those facts."

The jury, by unanimous vote, found defendant guilty of first-degree manslaughter.

In her first appeal, defendant challenged admission of the video, arguing that it was not relevant and that the court erred when it failed to conduct the OEC 403 balancing required by *State v. Mayfield*, 302 Or 631, 733 P2d 438 (1987). We rejected defendant's relevance argument, concluding that "the video satisfies the minimal standard for relevance established by OEC 401." *Alvarado*, 288 Or App at 753. However, we agreed with defendant that the court erred as a matter of law when it failed to conduct OEC 403 balancing. We also concluded that admission of the video was not harmless because, in light of "[t]he state's theory at trial *** that defendant knew of the control and abuse Elliott perpetrated on the children, and effectively acquiesced to that abuse," the video had a possible influence on the verdict rendered. *Id.* at 754. Accordingly, we reversed and remanded.

On remand, the trial court took written submissions and held a hearing to determine whether the video was admissible under OEC 403. At the hearing, the court stated that it had included OEC 403 considerations when it admitted the video, and proceeded to articulate those

considerations, emphasizing what it believed was the relevance of the video as discussed at trial:

> "I talked quite a bit on the relevance issue [at trial], the fact that a material element of the crime—and I noted in the defense memorandum that they acknowledged that the State must prove beyond a reasonable doubt that the defendant was aware of a substantial risk and disregarded it or should have been aware. And that was very important to the Court, as I mentioned previously. And so that came forward. That information came forward."

The court commented that the state had a "high need" for the evidence because it was the only evidence that showed a daily interaction with defendant, Elliott, and the children. The court also referred a couple of times to the timing of the video, stating that it would be around the time that A sustained her rib injury. And although not a basis for relevance admitted at trial, the court also commented on remand that "size and age does make a difference about injuries, how large the victim is, how large the perpetrator of the violence is. All of those things do come into play about what those injuries are."

Turning to OEC 403, the court focused on whether the unfair prejudice of the video outweighed its probative value. The court first concluded that Elliott recording and commenting on defendant's cleavage did not cause unfair prejudice to defendant. The court also determined that Elliott's use of racial slurs did not cause unfair prejudice to defendant, because it was not defendant who was saying those things. The court also stated that "it helped show that Mr. Elliott was someone to be concerned about with small children, given his actions and his conduct." In so stating, the court emphasized that "it's very relevant and important to have in what information the defendant had available to her, what she knew or should have known." The court also rejected defendant's argument that the video was unfairly prejudicial because it showed defendant was a "bad parent" or "puts her in a bad light," because the video showed Elliott's conduct, not hers. The court also stated that it did not see any basis on which to only admit portions of the video and noted that defendant did not make any such request. Because the court determined that the video was admissible

based on the reasoning of the court during trial, the court concluded that defendant was not entitled to a new trial.

Defendant now appeals, arguing that the trial court erred in concluding that the video was admissible under OEC 403; she challenges the trial court's conclusion that its probative value was not substantially outweighed by the risk of unfair prejudice it created.

OEC 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." We use the same *Mayfield* analytic framework that applies to a trial court's decision-making under OEC 403 as a guide in evaluating that decision on appeal. That framework sets out four parts:

> "First, the trial judge should assess the proponent's need for the *** evidence. In other words, the judge should analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence. In the second step the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime. The third step is the judicial process of balancing the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice, and the fourth step is for the judge to make his or her ruling to admit all the proponent's evidence, to exclude all the proponent's evidence or to admit only part of the evidence."

*Mayfield*, 302 Or at 645. The state had the burden to "convince the court that the evidence not only is logically relevant but also that its probative value is substantial enough to outweigh any attendant danger of unfair prejudice." *Id*. We review the court's decision to admit the challenged evidence under OEC 403 for an abuse of discretion. Here, we conclude that the trial court abused its discretion in admitting the video, because the court improperly evaluated both the probative value of the evidence and its prejudicial effect.

We begin with the first step identified in *Mayfield*, which is the state's need for the evidence. In doing so, we

emphasize that the state's trial theory was that mother was guilty of first-degree manslaughter—that is, that she "recklessly cause[d] the death of a child *** by neglect." ORS 163.118(1)(c)(B). The jury was instructed that "recklessly" means that the person "is aware of and consciously disregards a substantial and unjustifiable risk that the death of [A] will occur" and that "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." The court further instructed the jury that "neglect" means that "a person having custody or control of a child under ten years of age, with criminal negligence, leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of such child." As part of the lesser-included offense of criminally negligent homicide, the court instructed the jury that

> "[a] person acts with criminal negligence if that person fails to be aware of a substantial and unjustifiable risk that a particular circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

The risk the state identified to the jury, in the end, had to do with leaving A unattended in the bathtub; in the face of disputed evidence about how long A had been left unattended, the state emphasized evidence that A was left unattended for a longer period of time than mother acknowledged. The state specifically argued that the jury did not need to conclude that mother was aware that A was suffering from a lacerated pancreas and did not present evidence that she was so aware, although the evidence did indicate that mother was aware that A had vomited several times.

        With that context in mind, we review the state's need for the video evidence. The court identified two bases on which the evidence was relevant, placing the most emphasis on the first: (1) the video showed what defendant knew or should have known about the risks to A from Elliott; and (2) the video showed reasons for concern about Elliott being around small children. However, the state never proffered a particular need for the *video evidence* on those points in

the trial court, having argued on remand only that it had a great need for evidence of defendant's awareness without explaining how the video fulfilled any part of that need. Rather, on remand, the state argued that "it was the only evidence of [A] in life, showing her age, size, development, communication level, and dependence on others," and was also relevant to the jury's determination of the credibility of defendant's testimony about A in that regard. The trial court, however, did not admit the video at trial to show that information about A, having expressed that it would not admit the video solely for that purpose. On remand, the trial court only referred to A's size with respect to her relative size to Elliott and the risks he posed to her as a result—a need that the state never expressed for the evidence and not a use it made of the video at trial. The state's and the trial court's generalized statements about the need for evidence that has probative value of defendant's mental state says nothing about the probative value or need for this particular piece of evidence for that purpose. As a result, those statements by the trial court do not support the state's need for the video evidence.

Here, the video is not particularly probative of defendant's mental state with regard to a particular risk of death to A, nor has the state shown a need for the evidence in that regard, given the other evidence at trial. As the trial court noted, a central issue in the case was what defendant knew or should have known about the risk of death to A— but the probative value of the video in that regard is missing from the trial court's analysis. The state's primary theory was that defendant consciously disregarded the known risk to her three-year-old daughter from drowning if she was left unattended in the bathtub. The video has almost no probative value with respect to that theory, except as to A's size, which was not an issue in the case; mother's challenges to the state's evidence had more to do with the time she was left unattended. Indeed, the video showed A healthy, ambulatory, and perfectly capable of keeping her head above water in a bathtub, which cuts against the state's argument for needing the evidence.

The state's secondary theory at trial, which it expressly abandoned in its closing arguments, was that

defendant knew or should have known that her daughter was at risk of death when supervised by Elliott because he was an abusive person. With regard to that theory, the video had minimal probative value; it merely shows Elliott acting domineering to the children and making offensive comments to both defendant and the children, some of which he instructs A to parrot. That behavior is no doubt concerning and offensive, in a general sense, but it is only marginally probative as to whether defendant knew or should have known that A was at risk of death from him. Given that minimal probative value, the state had little need for the evidence, in light of the other evidence admitted at trial that had significantly more probative value as to defendant's mental state in that regard, including defendant's own text messages and statements that she knew Elliott hit the children and that she thought his punishments were excessive. *See Mayfield*, 302 Or at 646 (where the state put on other evidence of why the victim first denied abuse and then subsequently reported it, the evidence that her sister had also been abused added little to her reason for reporting).

We turn to the second step in *Mayfield*, which requires identification of the unfairly prejudicial effect of the evidence, if any. Evidence is unfairly prejudicial under OEC 403 if it has "an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one," *State v. Moore*, 324 Or 396, 407-08, 927 P2d 1073 (1996) (internal quotation marks omitted), and "will encompass situations in which the trier of fact will be improperly affected by factors unrelated to the fact of consequence for which a particular piece of evidence has been offered." *State v. Langley*, 363 Or 482, 514-15, 424 P3d 688 (2018), *adh'd to as modified on recons*, 365 Or 418, 446 P3d 542 (2019), *cert den*, 141 S Ct 138 (2020).

Here, the trial court articulated that it did not believe that the video had an unfairly prejudicial effect, because it showed the conduct of Elliott and not of defendant. We disagree. In the video, defendant laughs at some of Elliott's offensive comments, uses profanity herself, and, other than evincing a gasp when he says "what's up, nigger" to X and putting a stop to his attempt to convince the children to wrestle, appears to take no issue with how Elliott

interacts with her or her children. To say that the video has no bearing on how the jury would view defendant ignores all of that context. Particularly given its low probative value as to defendant's criminal culpability, a jury viewing the video evidence would likely use it as proof that defendant is a bad parent or had bad parental judgment in general and, thus, is more deserving of punishment. Essentially, the video evidence creates the danger that the jury will use the evidence to employ impermissible propensity reasoning—that a person has a disposition or propensity to act in conformance with their character—"which can detract from the factfinder's ability to neutrally and thoroughly assess the evidence in the case[,] creat[ing] a risk that verdicts will be affected by bias at a conscious or subconscious level." *State v. Skillicorn*, 367 Or 464, 479, 479 P3d 254 (2021). That is an improper use of that evidence, because it is based on an appeal "to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact." *State v. Sanchez-Cruz*, 177 Or App 332, 343, 33 P3d 1037 (2001), *rev den*, 333 Or 463 (2002).

In the third step of *Mayfield*, we must look at the balance struck by the trial court as to the first two steps. In doing so, the court in *Mayfield* instructed that "[i]t does not necessarily follow that the greater [the] probative value the less the prejudice, or vice versa. Probative value and prejudice exist independently." 302 Or at 646. Here, the trial court gave too much weight to the probative value of the video and too little weight (that is, none) to the danger of unfair prejudice. Thus, the trial court erred in evaluating and striking the balance between the two. We conclude that the probative value of the video, and the state's need for it, was so low when compared to the danger of the video's unfairly prejudicial effect that, as a matter of law, the court was required to exclude it or excise the prejudicial matter from it, as provided in step four of *Mayfield*. Here, the court surmised that the video could not effectively be edited. For the purposes that the court admitted the evidence—what defendant knew or should have known about Elliott—we agree; thus, the court should have excluded the video in its entirety. However, with regard to the secondary purposes for the video advanced by the state—to show A's stature,

dependence, and communication abilities—the video could easily have been shown without audio to depict A's stature or, to the extent the audio of A's communication abilities was probative, could have been edited to show a short clip of A saying nonoffensive things, such as when she tells Elliott she was playing with her toys. As discussed above, the probative value of the remainder of the video was substantially outweighed by the danger of unfair prejudice, and the court erred when it declined to exclude it.

Finally, the trial court's error was not harmless. An error is harmless when there is "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). "To determine whether an error was harmless, we examine the record as a whole and consider the nature of the error and the context in which it occurred." *State v. Kayfes*, 213 Or App 543, 555, 162 P3d 308, *rev den*, 343 Or 690 (2007). If the evidence is merely cumulative of other evidence at trial, it more likely did not affect the verdict, but "the less substantial the evidence of guilt, the more likely it is that an error affected the result." *Id*. Also, "[e]rroneously admitted evidence is more likely to affect the verdict where it is qualitatively different than the rest of the admitted evidence." *State v. Roberts*, 291 Or App 124, 137-38, 418 P3d 41 (2018). Here, the video evidence was qualitatively different than the other evidence at trial—the only other video played at trial was an interview of X—and would likely have particularly drawn the attention of the jury. The state also argued extensively about what it believed the video showed in closing argument, further drawing the jury's attention to it. The video's low probative value as to defendant's mental state, particularly in light of the state's abandonment of the theory of culpability to which the video pertained, increases the likelihood that the jury used it for an improper purpose in its consideration of defendant's guilt. This also is not a case in which the evidence of defendant's guilt was overwhelming. Accordingly, we reverse and remand for a new trial.

Reversed and remanded.